An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored but may be permitted in accordance with the provisions of Rule 30(e)(3) of the *North Carolina Rules of Appellate Procedure*.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-393

Filed 19 November 2025

Chowan County, Nos. 21JT000007-200, 21JT000008-200, 21JT000009-200, 21JT000010-200, 21JT000011-200, 21JT000012-200, 21JT000013-200

IN THE MATTER OF: S.H., L.H., J.H., L.H., J.H., L.H., & L.H.

Appeal by Respondent-Father from orders entered 29 July 2024 and 31 July 2024 by Judge Amber Davis in Chowan County District Court. Heard in the Court of Appeals 29 October 2025.

*Peter Wood, for the respondent-appellant father.*

*Hornthal, Riley, Ellis & Maland, LLP, by Lauren Arizaga-Womble, for the petitioner-appellee Chowan County Department of Social Services.*

*Brittany T. McKinney, for the petitioner-appellee Guardian ad Litem.*

STADING, Judge.

Respondent-Father ("Father") appeals from the trial court's orders that terminated his parental rights to S.H. ("Sam"), L.H. ("Larry"), J.H. ("Jim"), L.H. ("Lisa"), J.H. ("Jerry"), L.H. ("Lance"), and L.H. ("Lonnie").[1] On appeal, Father challenges several adjudicatory findings of fact as unsupported by clear, cogent, and

---

[1] We use pseudonyms to protect the identities of the minor children. N.C. R. App. P. 42(b) ("Appeals filed under N.C. [Gen. Stat.] § 7B-1001 . . . must use initials or a pseudonym instead of the minor's name.").

convincing evidence. Father also maintains the trial court erroneously concluded that his parental rights were subject to termination under N.C. Gen. Stat. § 7B-1111(a)(1)–(2) (2023). After careful consideration, we affirm the trial court's order.

## I. Factual and Procedural Background

Father and Respondent-Mother ("Mother") are the natural parents of Sam, Larry, Jim, Lisa, Jerry, Lance, and Lonnie. Although Mother's parental rights were simultaneously terminated by the trial court, this appeal solely concerns the termination of Father's parental rights over the minor children.[2]

On 24 March 2021, the Chowan County Department of Social Services ("DSS") received a report stating that Father had engaged in an act of domestic violence in front of the minor children. The report alleged that Father threw Mother "across the coffee table because [he] believed [she] had his phone." A later investigation revealed that: "there was ongoing domestic violence in the marriage . . . dating back for years"; "the domestic violence occur[red] in front of the children"; and Sam and Larry previously "attempted to intervene." As a result, Mother obtained an ex parte domestic violence protective order that same day; she also obtained a one-year protective order on 3 May 2021.

On 21 June 2021, DSS filed petitions alleging that the minor children were neglected juveniles. The petitions mirrored each other, asserting that the minor

---

[2] Mother did not appeal from the trial court's termination order.

children did not receive proper care, supervision, or discipline, and lived in an environment injurious to their welfare. The matter came on for a hearing on 9 September 2021, at which Father stipulated to various findings concerning the neglect of the minor children. In addition to the domestic violence report described above, the trial court found that: Father tested positive for amphetamines on 7 April 2021; the family had prior DSS involvement for domestic violence in the home, including with the Virginia Department of Social Services, the Matthews County Department of Social Services, and the James City Department of Social Services; and since 2019, there was a history of 911 calls from the residence for "domestic disputes/violence, shots fired, and substance abuse."

The trial court ultimately adjudicated the minor children as neglected pursuant to N.C. Gen. Stat. § 7B-101(15) (2023), ordered reunification as the primary plan, ordered guardianship as the secondary plan, and set the following case plan for Father:

> [Father] . . . will comply with random drug screening which may include hair follicle drug testing at the discretion of the Department.
>
> . . . .
>
> [Father] will participate and comply with the Out of Home Services Agreement and recommendations.
>
> [Father] will participate in perpetrator domestic violence counseling.
>
> [Father] will participate in substance abuse counseling and

comply with the recommendations.

[Father] will maintain stable housing.

[Father] will cooperate with child support.

[Father] . . . will participate and complete a Parenting Capacity Evaluation.

From December 2021 through March 2024, the trial court conducted five permanency planning hearings to evaluate Mother's and Father's progress on their respective case plans. Although Father demonstrated progress at times, the orders entered as a result of those proceedings reflect that Father failed to make progress toward several objectives of his case plan, including completing perpetrator domestic violence treatment, completing anger management courses, maintaining stable housing, and maintaining stable finances.

In the December 2021 permanency planning order, the trial court found that Father resided with Mother notwithstanding DSS's domestic violence concerns. The trial court also found that Father was working at the same place of employment as Mother, Nebraska Plastics; received substance abuse services with Dream Provider; completed Triple P Parenting classes; and began domestic violence counseling with Pathways to Change. Notwithstanding this progress, the trial court further found that domestic violence continued to occur within the home, specifically referencing three different events between Father and Mother:

48. There are concerns by the Department, the Guardian ad litem, and this Court that there is ongoing domestic

- 4 -

violence which is not being truthfully reported and blamed on other persons or situations.

49. On August 2, 2021, four (4) calls were made to the Chowan County Communications Center from the . . . residence regarding domestic disputes. Three of those calls were made by [Father] stating that [Mother] assaulted him, banged on his bedroom door, left the home and is driving while intoxicated with illegal tags and that she returned home but didn't want her there. No charges were filed by [Father] or [Mother].

50. On August 3, 2021, a call was made from . . . the residence . . . from a male friend of [Father] and [Mother], . . . stating that [Father] had hit [Mother] upside the head and that [Mother] has ice on it. . . . No charges were filed by [Mother].

51. On September 4, 2021, [Father] made a call to Bertie County Communications Center regarding an alleged assault by [Mother] while they were in their vehicle driving down US 17. [Father] alleged [Mother] was intoxicated, assaulted him and left him on the side of the road. No charges were filed by [Father].

. . . .

53. [Father] and [Mother] report they plan to do marriage counseling and deny ongoing domestic violence in the home.

In the February 2022 permanency planning order, the trial court noted that Father attacked Mother at work by strangling her. As a result, Father's employer fired him, and he was arrested for assault. The trial court further found that: Father no longer lived with Mother following the incident at their place of employment; Father denied assaulting Mother at work; Father alleged Mother was continuing to use drugs and was "out of control"; Father continued "to blame [Mother] for the

children being in care"; and Father remained "fixated on making negative reports about [Mother] . . . rather than focusing on his case plan and progress." Although Father obtained new employment with Daedalus Yachts following his termination at Nebraska Plastics, the trial court highlighted that he tested positive for controlled substances three different times, had not scheduled any follow up appointments with Dream Provider, and needed to address the causes of the domestic violence despite his separation from Mother. The trial court also noted the results of Father's parenting capacity evaluation, which recommended that reunification with the minor children should only be initiated if Father satisfied the following criteria:

> Dr. Rawls recommends, reunification of the minor children with [Father] should only be initiated if the following are met: [Father] shall participate in individual substance abuse counseling and participate[ ] in substance abuse support groups; continued participation in domestic violence treatment; random drug screenings with negative results; maintain financial stability; maintain[ ] stable housing; [Father] does not have any reports of abuse and/or neglect; [Father] refrains from any domestic violence incidents with [Mother]; [Father] shall not incur any criminal charges and/or arrest; and he shall participate in family therapy (once he and his wife reach a level of marital stabilization.

In the May 2022 permanency planning order, the trial court noted that Father had moved for the fourth time since the minor children entered into care, and that the rental home he was residing in was not suitable for the minor children's needs. It also found that: Father continued to harass Mother notwithstanding a no-contact order; Father continued to make accusations as to Mother's conduct to DSS; Father

failed to "recognize his role in the children's removal and continued absence from the home"; and Father repeatedly made negative accusations about Mother to the minor children during visitations. With respect to his treatment at Dream Provider, the trial court found that Father failed to report his domestic violence episodes; continued to minimize his actions; and possessed several "current risk behaviors," including "sexual behaviors, physical abuse, violent behaviors, sexual assault, and self-injury." The trial court also noted that Father "was terminated[3] from the Pathways to Change Domestic Violence Batterer's Program," and had not "reengaged in domestic violence treatment." With respect to his parenting capacity, the trial court noted several additional observations from his prior evaluation with Dr. Rawls:

> Dr. Rawl's concluded [Father's] level of psychological and parenting functioning suggest a level of impairment that hinders his protective capacity. His current level of psychological and parenting functioning suggests a level of impairment in his behavioral, cognitive, and emotional protective capacity. [Father] demonstrated difficulty with impulse control and violence. He has adequate skills to fulfill the material aspects of caregiving such as food, shelter, clothing and financial. However, he struggles in fulfilling the emotional and safety responsibilities of caregiving. He struggles with self-awareness and recognizing that his domestic violence and substance abuse is a threat to his children. He does not appear to comprehend that his display of domestic violence and substance abuse negatively impacts the resilience of his children.

---

[3] Father was terminated from the program "due to continued domestic violence and breaking the program agreement."

In view of these findings, the trial court concluded that DSS "should no longer be required to make reasonable efforts" toward reunification, ordered adoption as the primary plan, and ordered guardianship as the secondary plan.

In the December 2022 permanency planning order, the trial court found that Father had maintained his employment at Daedalus Yachts. Otherwise, the trial court observed that Father had not made any further progress to his case plan. And in the final permanency planning order, heard March 2024, the trial court noted, inter alia, that Father: was residing in the family home; failed to timely pay the mortgage or utilities on the family home; continued to make negative reports about Mother; continued to not take responsibility for the incidents that led the children to enter into care; failed to enroll in an anger management course; failed to re-engage in perpetrator domestic violence counseling; failed to update DSS on progress in his case plan; and failed to acknowledge or recognize the impact his actions had on the minor children.

On 25 October 2022, DSS petitioned to terminate Father's parental rights over the minor children on the grounds of neglect and willful failure to make reasonable progress toward correcting the conditions which led to their removal. *See* N.C. Gen. Stat. § 7B-1111(a)(1)–(2). The trial court conducted several hearings to resolve the matter, spanning from January 2023 through March 2024. At the adjudicatory stage, the trial court concluded that Father's parental rights were subject to termination on both grounds. And at the dispositional phase, the trial court concluded that

termination of Father's parental rights was in the best interests of the minor children. To memorialize its decision, the trial court entered two separate orders—an adjudication order on 29 July 2024 and a dispositional order on 31 July 2024. Father entered a notice of appeal from both orders on 30 August 2024.

## II. Jurisdiction

This Court has jurisdiction over Father's appeal pursuant to N.C. Gen. Stat. §§ 7A-27(b)(2) (2023) ("From any final judgment of a district court in a civil action"), and 7B-1001(a)(7) (2023) (Appeal of right from "[a]ny order that terminates parental rights or denies a petition or motion to terminate parental rights.").[4]

## III. Analysis

Father challenges several findings of fact rendered at the adjudicatory stage of the termination proceeding. He also maintains the trial court's adjudicatory findings

---

[4] Although not argued by any of the parties, we note that Father's notice of appeal was filed on 30 August 2024—more than thirty days after the trial court entered its adjudication order. *See* N.C. R. App. P. 3.1(b) ("Any party entitled to an appeal . . . may take appeal by filing notice of appeal . . . in the time and manner set out in N.C. [Gen. Stat.] § 7B-1001(b) and (c)[.]"); *see also* N.C. Gen. Stat. § 7B-1001(b) (2023) ("Notice of appeal . . . shall be given in writing by a proper party as defined in G.S. 7B-1002 and shall be made within 30 days after entry and service of the order in accordance with G.S. 1A-1, Rule 58."). The record, however, does not reveal when the order was served pursuant to N.C. Gen. Stat. § 1A-1, Rule 58 (2023), and neither DSS's nor the GAL's brief argue whether Father received notice of the order more than thirty days before he filed his notice of appeal. *See, e.g., Adams v. Langdon*, 264 N.C. App. 251, 255, 826 S.E.2d 236, 239 (2019) (quoting *Brown v. Swarm*, 257 N.C. App. 418, 422, 810 S.E.2d 237, 240 (2018)) ("[W]here . . . there is no certificate of service in the record showing *when* appellant was served with the trial court judgment, *appellee* must show that appellant received actual notice of the judgment more than thirty days before filing notice of appeal in order to warrant dismissal of the appeal. . . . [U]nless the appellee argues that the appeal is untimely, and offers proof of actual notice, we may not dismiss. Appellee-Plaintiff has not argued Intervenor's appeal is untimely or offered proof of Intervenor's actual notice of the 9 October 2017 Order to Dismiss; therefore, Intervenor's Notice of Appeal from that Order is deemed timely filed."). Accordingly, we deem Father's notice of appeal as timely and proceed to the merits.

do not support its ultimate conclusion—that his parental rights were subject to termination on the grounds of neglect and willful failure to make reasonable progress. After careful consideration, we affirm the trial court's adjudication order on the basis of neglect.

## A. Standard of Review

"Our Juvenile Code provides for a two-stage process for the termination of parental rights: the adjudicatory stage and the dispositional stage." *In re Z.L.W.*, 372 N.C. 432, 434, 831 S.E.2d 62, 64 (2019). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re T.N.H.*, 372 N.C. 403, 406, 831 S.E.2d 54, 58 (2019) (citation omitted). "If [the trial court] determines that one or more grounds listed in section 7B-1111 are present, the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights." *Id.* (citations omitted). Thus, Father's arguments on appeal solely concern the trial court's actions at the adjudicatory stage of the termination proceeding. *See, e.g., In re J.I.G.*, 380 N.C. 747, 756, 869 S.E.2d 710, 716 (2022) ("Respondent-father does not appeal the trial court's dispositional conclusion that termination of respondent-father's parental rights would serve the best interests of the children.").

"We review a trial court's adjudicatory findings under N.C. [Gen. Stat.] § 7B-1109 to determine whether [they] are supported by clear, cogent and convincing

evidence and the findings support the conclusions of law. The trial court's conclusions of law are reviewable de novo on appeal." *In re K.N.*, 373 N.C. 274, 278, 837 S.E.2d 861, 865 (2020) (citations and quotation marks omitted). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the [trial court]." *In re C.V.D.C.*, 374 N.C. 525, 530, 843 S.E.2d 202, 205 (2020) (citation omitted) (alteration in original).

"A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re R.G.L.*, 379 N.C. 452, 456, 866 S.E.2d 401, 408 (2021) (citations omitted). "In making findings of fact, 'it is the trial judge's duty to consider all the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn from the testimony.'" *In re R.D.*, 376 N.C. 244, 258, 852 S.E.2d 117, 129 (2020) (citation omitted). "Unchallenged findings are deemed to be supported by the evidence and are binding on appeal." *In re A.A.M.*, 379 N.C. 167, 172, 864 S.E.2d 509, 514 (2021) (citations and quotation marks omitted). "Moreover, we review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." *In re T.N.H.*, 372 N.C. at 407, 831 S.E.2d at 58–59.

## B. Findings of Fact

Father purports to challenge Findings of Fact Nos. 68–73, 77, 78, 84, 86–89, 91, 93, 95, 98, 100, 102, 105, and 107 in his appellate brief. However, aside from re-

- 11 -

stating the findings in block-quote fashion, Father makes no argument in accordance with the applicable standard of appellate review for the vast majority of these findings. *See, e.g., In re S.W.*, 175 N.C. App. 719, 724, 625 S.E.2d 594, 597 (2006) (quoting N.C. R. App. P. 28(b)(6)) ("Assignments of error . . . in support of which no reason or argument is stated or authority cited, will be taken as abandoned."); *see also, e.g., In re C.D.A.W.*, 175 N.C. App. 680, 688, 625 S.E.2d 139, 144 (2006) (If an appellant's assignment of error "is void of any discernible argument or citation [to] authority for such a claim," the argument is deemed abandoned under the North Carolina Rules of Appellate Procedure.).

A close reading of Father's appellate brief reveals that his argument as to all twenty-one challenged findings consists of the following summation:

> The evidence at the hearing showed that [Father] had complied with the case plan in its entirety with one exception. He had not participated in all the required treatments for domestic violence. However, since he and his wife no longer had a relationship and had no plans to reconcile, the domestic violence treatment was not needed. The evidence showed no probability of a repetition of neglect.

Yet, the disputed findings encompass far more factual information than the arguments provided on appeal by Father. In any event, we will address each of Father's contentions in accordance with the relevant finding of fact. *See, e.g., In re E.H.*, ___ N.C. ___, ____, 919 S.E.2d 233, 239 (2025) ("[T]he Court of Appeals should not address issues not raised or argued by the parties . . . .").

Father argues at the time of the termination proceeding, the evidence shows he had "substantially complied" with his case plan. He maintains the only portion of his case plan that he had not complied with was attending domestic violence counseling. Father asserts that he: had sufficient employment; had stable housing; had consistently paid child support; and had completed substance abuse treatment. Father further contends—without citing *any* record evidence—that once he and Mother separated, he no longer needed to attend perpetrator domestic violence counseling. Finally, Father maintains there is a lack of clear, cogent, and convincing evidence showing a likelihood of future neglect if the minor children were returned to his care since he made reasonable progress toward his plan.[5] Thus, in substance, Father appears to have challenged portions of Findings of Fact Nos. 86–87 and 102 as unsupported by clear, cogent, and convincing evidence:

> 86. . . . [Father] resumed possession of the family home from [Mother] on or about September 2022. During the pendency of the underlying juvenile proceedings, [Father] changed [his] living location four times. The status of appropriateness of [Father's] residence is unknown [ ]at this time. Since regaining possession of the home, [Father] has not requested [DSS] do a visit or home study to assess safety for the children and no evidence regarding the same was presented to this Court.

> 87. Although [Father] is employed full-time there

---

[5] "[T]he trial court's determination that neglect is likely to reoccur if [the juvenile] was returned to his care is more properly classified as a conclusion of law." *In re J.O.D.*, 374 N.C. 797, 807, 844 S.E.2d 570, 578 (2020). Since this portion of Finding of Fact No. 102 "is a conclusion of law, [ ] we will review it as such in conjunction with [Father's] challenges to the trial court's conclusion of law that [his] parental rights should [not have] be[en] terminated on the ground of neglect." *In re A.S.T.*, 375 N.C. 547, 554, 850 S.E.2d 276, 282 (2020).

continues to be a question regarding his financial stability and ability to maintain stable housing. . . . [Father] has been employed fulltime at Daedalus Yachts since on or about February 2022.

. . . .

102. [Father] has made insufficient progress as to a change in condition in that he has failed to engage with the Department and work toward reunification; he continues to be dishonest with the Court, DSS, and the GAL; he has failed to engage and complete services for domestic violence abuser/batterers intervention treatment which has been court ordered since Disposition in the underlying juvenile case which occurred 29 months ago; he has failed to attend and complete anger management class/program; he continues to be focused on blaming [Mother] and fails to acknowledge his role in the domestic violence and the impact domestic violence has on the children all of which reflect a pattern consistent with the neglect of the children. The conditions which led to removal of the children have been ongoing with the . . . family since at least 2010 and in multiple states and involving multiple different DSS agencies. Thus, there is a strong probability of repetition of neglect if the children were returned to his care. . . .

After careful consideration, we disagree with Father's contentions. As analyzed below, the challenged portions of these findings are supported by clear, cogent, and convincing evidence. *In re R.G.L.*, 379 N.C. at 456, 866 S.E.2d at 408.

Although Father and Mother separated after Father assaulted her at their mutual place of employment, the record reflects that attending and completing perpetrator domestic violence counseling remained an integral component of his case plan, as it was one of the primary reasons which led to the removal of the minor children from Father's care. Indeed, a social worker at the termination hearing

testified that at the time of the proceeding, Father was required to complete the Batterer's Intervention Program ("BIP") and had not done so. Accordingly, Father's argument on this basis is overruled.

Father also incorrectly asserts the only portion of his case plan that he failed to comply with was completing domestic violence counseling via the BIP. Indeed, the prior permanency planning orders, unchallenged findings, and testimonies from the termination hearing demonstrate that in addition to not completing the BIP, Father failed to: maintain stable housing; maintain stable finances; and complete anger management treatment.

With respect to housing and finances, Father testified to living in the family home since September 2022 at the termination hearing. During his occupation of the family home, Father conceded that the mortgage and utilities remained unpaid, causing him to file for bankruptcy. However, he testified that his bankruptcy case was still "active," and his payments were "current." By contrast, the social worker testified that Father's bankruptcy filing "was dismissed due to lack of follow through with arrangements." *In re R.D.*, 376 N.C. at 258, 852 S.E.2d at 129. And unchallenged Findings of Fact Nos. 88–89 expressly note that the mortgage was currently delinquent, and his bankruptcy matter was dismissed on 27 July 2023 due to failure to make timely payments:

> 88. The mortgage at the family home is currently delinquent. Prior to [DSS] becoming involved the parties were behind on their bills, mortgage, and utilities.

> Throughout the case the mortgage has been behind on multiple occasions and the utilities have been disconnected at different times.

> 89. [Father] testified he was unaware the mortgage was behind prior to resuming possession of the home in September 2022 and that he was current with his payments through bankruptcy. However, [Father's] prior statements, testimony, and Bankruptcy documentation establish [Father] knew the mortgage was delinquent when he was residing with [Mother] prior to January 2022 and that his Bankruptcy payments were not current and there were multiple motions filed to dismiss his bankruptcy for failure to pay, failure to comply with the payment plan, and that the Bankruptcy was ultimately dismissed on July 27, 2023 for failure to make payment and comply with the plan.

*In re A.A.M.*, 379 N.C. at 172, 864 S.E.2d at 514. This evidence tends to support Findings of Fact Nos. 86–87 in that Father remained unable to provide consistent financial stability or maintain a suitable home at the time of the termination proceeding.

Father also testified that he was "current" on his utilities at the time of the proceeding, but DSS Exhibit No. 10—an affidavit from the custodian of the town utility records—expressly provides that Father carried a past due balance of $367.20 as of February 2023. Moreover, since Father's occupation of the family home in September 2022, Father's utilities carried an outstanding balance every month, spanning from approximately $60 to $888.97—further evidencing an inability to provide financial stability or a stable home for the minor children. The social worker added that the payment of utilities was an ongoing issue during the period of time in

which Father was in possession of the family home. Additionally, Father does not challenge the portion of Finding of Fact No. 86 that provides the family home had not been approved for residence by DSS. *In re A.A.M.*, 379 N.C. at 172, 864 S.E.2d at 514. Accordingly, we hold there is clear, cogent, and convincing evidence to support the challenged portions of Findings of Fact Nos. 86–87.

With respect to anger management treatment, Father conceded that it was part of his case plan with DSS at the hearing. Father also conceded that he could have attended the program with Dream Provider in January 2023 but voluntarily elected not to. Additionally, the prior permanency planning orders demonstrate that Father failed to complete anger management treatment, and Father does not challenge the portion of Finding of Fact No. 102 which provides he failed to complete anger management treatment. *In re T.N.H.*, 372 N.C. at 407, 831 S.E.2d at 58.

Accordingly, we hold the challenged portions of Findings of Fact Nos. 86–87 and 102 are supported by clear, cogent, and convincing evidence. And since a trial court's determination of the likelihood of future neglect "is a conclusion of law, . . . we will review it as such in conjunction with [Father's] challenges to the trial court's conclusion of law that [his] parental rights should [not have] be[en] terminated on the ground of neglect." *In re A.S.T.*, 375 N.C. at 554, 850 S.E.2d at 282.

### C. Termination Grounds

Father asserts the trial court erroneously concluded that his parental rights were subject to termination on the basis of neglect and willful failure to make

reasonable progress. Father argues the trial court's findings do not support the ground of neglect because the trial court did not properly find a probability of future neglect. We disagree. And since only one ground is required to uphold a trial court's termination order, we decline further review. *In re C.K.I.*, 379 N.C. 207, 210, 864 S.E.2d 323, 326 (2021) ("Because a single ground for terminating parental rights is sufficient to support a termination order, this Court can uphold the trial court's order based on one ground without reviewing any remaining ground."); *In re Z.A.M.*, 374 N.C. 88, 98–99, 839 S.E.2d 792, 799 (2020) ("Because we conclude that the trial court properly terminated respondent-father's rights based on neglect, we need not determine whether termination is proper under N.C. [Gen. Stat.] § 7B-1111(a)(2) based on respondent-father willfully leaving the children outside the home and his failure to make reasonable progress.").

A trial court may terminate a parent's parental rights upon a finding that the parent has "neglected the juvenile." N.C. Gen. Stat. § 7B-1111(a)(1). A "juvenile shall be deemed to be . . . neglected if the court finds the juvenile to be . . . a neglected juvenile within the meaning of G.S. 7B-101." *Id.*; *In re Z.G.J.*, 378 N.C. 500, 509, 862 S.E.2d 180, 187 (2021) (citation omitted) ("This subsection allows for parental rights to be terminated if the trial court finds that the parent has neglected their child to such an extent that the child fits the statutory definition of a 'neglected juvenile.'"). A neglected juvenile is defined under Chapter 7B as "[a]ny juvenile less than 18 years of age . . . whose parent, guardian, custodian, or caretaker does any of the following":

a. Does not provide proper care, supervision, or discipline.

b. Has abandoned the juvenile, except where that juvenile is a safely surrendered infant as defined in this Subchapter.

c. Has not provided or arranged for the provision of necessary medical or remedial care.

d. Or whose parent, guardian, or custodian has refused to follow the recommendations of the Juvenile and Family Team made pursuant to Article 27A of this Chapter.

e. Creates or allows to be created a living environment that is injurious to the juvenile's welfare.

f. Has participated or attempted to participate in the unlawful transfer of custody of the juvenile under G.S.14-321.2.

g. Has placed the juvenile for care or adoption in violation of law.

N.C. Gen. Stat. § 7B-101(15)(a)–(g) (2023).

"Generally, '[t]ermination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing.'" *In re M.B.*, 382 N.C. 82, 86, 876 S.E.2d 260, 264 (2022) (citation omitted). However, if the evidence does not show that "the parent is neglecting his or her child at the time of the termination hearing because 'the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent.'" *In re Z.A.M.*, 374 N.C. at 95, 839 S.E.2d at 797 (citation omitted). "In such cases, a trial court may terminate parental rights based upon prior neglect of the juvenile if the trial court *finds by clear and convincing evidence a*

*probability of repetition of neglect* if the juvenile were returned to [his or] her parents." *In re M.B.*, 382 N.C. at 86, 876 S.E.2d at 264 (citation omitted) (bracket in original).

"When determining whether such future neglect is likely, the district court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing." *In re Z.G.J.*, 378 N.C. at 509, 862 S.E.2d at 187. In addition, "a trial court may [also] consider 'whether the parent has made any meaningful progress in eliminating the conditions that led to the removal of the children.'" *In re M.B.*, 382 N.C. at 86, 876 S.E.2d at 265 (citations omitted). "The determinative factors," however, "must be the best interests of the child and the fitness of the parent to care for the child *at the time of the termination proceeding.*" *In re Z.V.A.*, 373 N.C. 207, 212, 835 S.E.2d 425, 430 (2019) (citation omitted). "After noting these factors, the trial court must then distinctly determine a parent's likelihood of neglecting a child in the future." *In re M.B.*, 382 N.C. at 86, 876 S.E.2d at 265.

Our de novo review leads us to conclude the trial court's findings of fact support its conclusion of law—that Father's parental rights were subject to termination on the ground of neglect. *In re K.N.*, 373 N.C. at 278, 837 S.E.2d at 865. Since we have already determined the challenged portions of the findings are supported by clear, cogent, and convincing evidence in section A of this opinion, they are "conclusive" on appeal. *In re R.G.L.*, 379 N.C. at 456, 866 S.E.2d at 408. And since Father does not challenge the remaining adjudicatory findings, we are bound by them. *In re A.A.M.*,

379 N.C. at 172, 864 S.E.2d at 514.

Here, the trial court rendered an unchallenged finding demonstrating that the minor children were previously adjudicated as neglected on 9 September 2021. *In re Z.A.M.*, 374 N.C. at 95, 839 S.E.2d at 797. Then, the trial court rendered a battery of different findings as to the changes Father made between the period of past neglect and the time of the termination hearing, including Father's progress and pitfalls:

> 68. [Father] has been consistently out of compliance with significant aspects of his case plan primarily related to domestic violence which is the basis of the Department's involvement in this matter and that of the other DSS agencies over the last 10 years. Throughout the proceedings [Father], although confronted about his acts of domestic violence, he continued to deny the same, denied he was responsible for the events which led to the children being removed and declined to engage in services necessary to address the same.
>
> 69. [Father] continues to deny the domestic violence occurred in the presence of the children. He testified [Mother] was the aggressor and he was the victim. [Father's] contentions about the domestic violence are inconsistent with the substantial evidence to the contrary including but not limited to 911 records, including the children's call for help in March 2021.
>
> 70. [Father] is fixated on the wrongdoings of [Mother] and redirecting others to her challenges rather than focusing on addressing his shortcomings. [Father] used removal of the children by DSS due to [Mother's] substance abuse as a threat to control [Mother] throughout their relationship. When [Mother] would separate from him or bring criminal charges against him for assaulting her, [Father] would consistently call DSS in an attempt to have the children removed from her care and then use their children's threat of removal as a means to reconcile with [Mother]. [Father]

- 21 -

and [Mother] would then report to DSS that [Mother] and all conditions of concern were resolved.

71. Regarding the parties['] separation status, both parties report they are no longer together, however, [Father] has been inconsistent and dishonest in his testimony regarding the parties['] contact. [Father] testified he had not seen [Mother] since December 2021 when he was charged with assaulting her at their place of employment but other evidence and his and [Mother's] testimony also has been that they were together off and on throughout December 2021 and 2022 until the Department filed petitions for termination of parental rights. [Father] and [Mother] have consistently had contact throughout their relationship/ marriage during periods when the same was prohibited by DSS safety plans, domestic violence protective orders and conditions of release for pending criminal charges.

72. There has been an ongoing pattern of control and sabotage towards [Mother] on the part of [Father] through representing they were working on their marriage, insisting they work joint case plans all while making reports to the Department of her wrongdoings, taking out criminal charges on her and engaging in domestic violence.

73. There is a history of [Father] taking out criminal charges or making calls/reports to law enforcement and/or the Department regarding [Mother's] alleged wrongdoings when she takes steps to separate from him, obtain a domestic violence protective order.

. . . .

77. [Father] engaged in therapy with Dream[ ] Provider[ ] in April 2021. Dream[ ] Provider[ ] provided individual therapy to [Father] based on a clinical assessment of self-report[ed] data they received from [Father]. [Father] reported to [D]ream[ ] [Provider] he was referred by Chowan DSS due to his wife attacking him. He reported [Mother] was the aggressor and took out a domestic violence protective order against him out of vengeance. In December 2022, [Father's] therapy goals were 1) his kids

will respect him for not being with their abusive mom 2) it's not me 3) I'm much better off now than with her.

78. [Father] was consistently dishonest with the provider regarding domestic violence, including reporting he completed the [BIP] class and volunteered to take anger management classes which he was attending, thereby avoiding services and treatment to address the continued cycle of domestic violence.

. . . .

80. [Father] was ordered to complete the [BIP] . . . on September 9, 2021. [Father] enrolled in the class on October 7, 2021 and completed 21 weeks out of 26 before he was terminated on March 23, 2022 from the program for being charged with new acts of domestic violence, specifically assaulting [Mother] at work. Following termination, the program requires participants to start over unless a court order mandates otherwise.

81. [Father] requested the court order him only to complete the remaining 5 weeks of the program rather than requiring he start over. . . . [Father's] request was not granted at the May 12, 2022 permanency planning hearing.

82. On January 23, 2024, [Father] arrived at the Department and requested to speak to the new social worker. [Father] reported to the social worker about [Mother's] situation, and history of substance abuse. When redirected to share about his compliance with his case plan, [Father] reported he was now participating in a 26-week batterer's intervention course, but could not provide a name or any supporting documentation of the same. To date, [Father] has not enrolled in or completed a [BIP].

83. [Father's] case plan included his attendance and completion of anger management classes. . . . To date, [Father] has not engaged in or completed anger management classes.

- 23 -

. . . .

85. [Father] participated in a parenting capacity evaluation with Dr. Rawls who concluded [Father's] level of psychological and parenting functioning suggest a level of impairment that hinders his protective capacity. His current level of psychological and parenting functioning suggests a level of impairment in his behavioral, cognitive, and emotional protective capacity. [Father] demonstrated difficulty with impulse control and violence. He has adequate skills to fulfill the material aspects of caregiving such as food, shelter, clothing and finance[es]. However, he struggles in fulfilling the emotional and safety responsibilities of caregiving. He struggles with self-awareness and recognizing that his domestic violence and substance abuse is a threat to his children. He does not appear to comprehend that his display of domestic violence and substance abuse negatively impacts the resilience of his children.

86. . . . [Father] resumed possession of the family home from [Mother] on or about September 2022. During the pendency of the underlying juvenile proceedings, [Father] changed living location four times. The status of appropriateness of [Father's] residence is unknown at this time. Since regaining possession of the home, [Father] has not requested [DSS] do a visit or home study to assess safety for the children and no evidence regarding the same was presented to this Court.

87. Although [Father] is employed full-time there continues to be a question regarding his financial stability and ability to maintain stable housing. . . . [Father] has been employed fulltime at Daedalus Yachts since on or about February 2022.

88. The mortgage at the family home is currently delinquent. Prior to [DSS] becoming involved the parties were behind on their bills, mortgage, and utilities. Through the case the mortgage has been behind on multiple occasions and the utilities have been disconnected

at different times.

89. [Father] testified he was unaware the mortgage was behind prior to resuming possession of the home in September 2022 and that he was current with his payments through bankruptcy. However, [Father's] prior statements, testimony, and [b]ankruptcy documentation establish [Father] knew the mortgage was delinquent when he was residing with [Mother] prior to January 2022 and that his [b]ankruptcy payments were not current and there were multiple motions filed to dismiss his bankruptcy for failure to pay, failure to comply with the payment plan, and that the [b]ankruptcy was ultimately dismissed on July 27, 2023 for failure to make payment and comply with the plan.

. . . .

91. The parents have not remained in contact with [DSS] since reunification efforts were ceased in May 2022. . . . [Father] attended court proceedings but did not provide [DSS] with any update on his status nor request any assistance with obtaining services required by his case plan

92. [Father] testified at the December 2022 Permanency Planning Hearing that he would do anything he needed to do to have his children returned to his care and would contact DSS to engage in his plan. Since December 2022, [Father] has only contacted the agency on one occasion on January 23, 2024, where he requested a new social worker meet with him and spent the meeting telling them about [Mother's] substance abuse.

93. . . . [Father] has not had visitation with the children since August 2022. When the visits occurred, there was an ongoing concern with [Father] in that instead of focusing on the children he focused on updating the supervisor on what negative things [Mother] is doing and did so in the presence of the children. [Father] told the children he was working on his plan, but [Mother] was not. Despite being redirected [Father] continued to engage in this behavior

. . . .

95. Since visitation stopped in 2022, neither [Father] nor [Mother] has maintained contact with [DSS], have not asked about the children, provided any clothing, toys, gifts, notes, or letters.

. . . .

98. The parties have been involved with departments of social services in two states and in five different counties for approximately fourteen (14) years. The reasons for the Departments' involvement have been the same. The services recommended and rendered to the parents have been primarily focused to address substance abuse and domestic violence and the parents have been unsuccessful to make meaningful change to address the concerns for social services['] continued involvement.

. . . .

100. There is a substantial risk of physical, mental, or emotional impairment of the juvenile as a consequence of the actions of the [Father] . . . , and the failure by [Father] to provide proper care, supervision or discipline.

To briefly summarize, these findings tend to show that Father: (1) reported Mother as the aggressor to his therapy provider; (2) claimed Mother filed a DVPO against him "out of vengeance"; (3) "was consistently dishonest" with his therapy provider as to his role in the episodes of domestic violence; (4) falsely reported completing the BIP to his therapy provider; (5) deliberately avoided "services and treatment to address the continued cycle of domestic violence"; (6) continued to "avoid any responsibility for his act of domestic violence in his marriages"; (7) lacked "any insight into the impacts of the same on his ability to provide a safe, stable

environment for the children"; (8) was terminated from the BIP he was attending on 23 March 2022 for assaulting Mother at work; (9) failed to re-enroll in or complete a different BIP following his termination on 23 March 2022; (10) failed to complete an anger management course; (11) "demonstrated difficulty with impulse control"; (12) struggled with "the emotional and safety responsibilities of caregiving"; (13) failed to maintain stable housing or finances; (14) failed to timely pay his bills; (15) failed to maintain contact with DSS after reunification efforts were ceased in May 2022; and (16) contacted DSS only one time since December 2022, where he "spent the meeting telling [DSS] about [Mother's] substance abuse."

In view of these findings, the trial court then expressly determined the likelihood of future neglect if the children were returned to Father's care. *In re M.B.*, 382 N.C. at 86, 876 S.E.2d at 264. The trial court found that at the time of the hearing, and due to Father's failure to make reasonable progress toward his case plan, Father was likely to neglect the minor children in the future:

> 102. [Father] has made insufficient progress as to a change in condition in that he has failed to engage with the Department and work toward reunification; he continues to be dishonest with the Court, DSS, and the GAL; he has failed to engage and complete services for domestic violence abuser/batterers intervention treatment which has been court ordered since Disposition in the underlying juvenile case which occurred 29 months ago; he has failed to attend and complete anger management class/program; he continues to be focused on blaming [Mother] and fails to acknowledge his role in the domestic violence and the impact domestic violence has on the children all of which reflect a pattern consistent with the neglect of the children.

*The conditions which led to removal of the children have been ongoing with the . . . family since at least 2010 and in multiple states and involving multiple different DSS agencies. Thus, there is a strong probability of repetition of neglect if the children were returned to his care. In light of the evidence of the children being in custody for thirty-one (31) months, and the father's conduct and failure to make reasonable progress in a reasonable amount of time; and based on the high probability of repetition of neglect and pattern of neglect regarding [Father], the Court finds this is sufficient to establish the neglect ground exists at the time of [the] hearing.*

*. . . .*

105. That based upon the evidence and testimony presented and pursuant to North Carolina General Statutes § 7B-1111(a), *the Court finds . . . by clear, cogent, and convincing evidence . . . [that Father] has neglected the juvenile(s) and there is a probability of repetition of neglect if the juvenile(s) were returned to [Father's] custody.*

(emphasis added).

These findings support a determination that Father was likely to neglect the minor children moving forward since he: remained unable to provide proper, care supervision, or discipline over the course of the thirty-one months the minor children remained out of his custody; and "refused to follow the recommendations of the Juvenile and Family Team[.]" N.C. Gen. Stat. § 7B-101(15); *see also In re M.A.*, 374 N.C. at 870, 844 S.E.2d at 921 ("A parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect."). Although Father completed some portions of his case plan, he failed to complete the BIP, attend anger management courses, maintain financial stability, and maintain suitable housing. *In*

*re J.J.H.*, 376 N.C. 161, 185, 851 S.E.2d 336, 352 (2020) ("[A] parent's compliance with his or her case plan does not preclude a finding of neglect."). More importantly, Father also failed to consistently engage with DSS, acknowledge his wrongdoing in the domestic violence episodes, acknowledge that his actions contributed to the removal of the minor children, or recognize the impact the domestic violence episodes had on the minor children. *See In re M.A.*, 374 N.C. at 874, 844 S.E.2d at 916; *see also In re L.N.G.*, 377 N.C. 81, 89–91, 855 S.E.2d 450, 456–58 (2021); *see also In re A.R.A.*, 373 N.C. 190, 198, 835 S.E.2d 417, 423 (2019). Instead, Father continued to blame Mother as the reason why the children were removed from his care—all of which speak to his likelihood to neglect the minor children moving forward.

For example, in *In re K.Q.*, the respondent similarly challenged the trial court's conclusion that grounds existed to terminate his parental rights under N.C. Gen. Stat. § 7B-1111(a)(1). 381 N.C. 137, 141, 871 S.E.2d 500, 503 (2022). The respondent maintained "he substantially completed the services required by his case plan and contend[ed] the trial court erred in determining that there was a likelihood of repetition of neglect." *Id.* at 142, 871 S.E.2d at 504. On appeal, the North Carolina Supreme Court disagreed with the respondent, concluding that the trial court's findings adequately demonstrated a failure to make reasonable progress and a likelihood of future neglect, as the respondent failed to "remediate the domestic violence that led to [the minor child's] removal." *Id.* Even though the respondent had made progress toward a majority of his case plan, the Court noted the findings

demonstrated: (1) there was a "long history of domestic violence which span[ned] across different states"; (2) the respondent "created a toxic, dangerous, and injurious environment" for the minor child; (3) the respondent played a role in the domestic violence episodes; (4) the respondent consistently "denied initiating domestic violence with the [mother], as well as denied knowing why the juvenile was placed in the custody of [DSS]"; and (5) the respondent "was not aware that [he] was the aggressor," thus preventing the necessary course of treatment. *Id.* at 143–44, 871 S.E.2d at 504–05.

The Court ultimately held that the trial court did not err by concluding there was a likelihood of repetition of neglect. *Id.* at 146, 871 S.E.2d at 506. The Court reasoned that

> domestic violence was clearly identified as the reason for [the minor child's] removal and respondent-father engaged in services required by his case plan to address the issue, respondent-father continued to deny his role in the domestic violence, failed to acknowledge the effects the domestic violence had on [the minor child], and refused to accept any responsibility for [the minor child's] removal. The unchallenged findings provide support for the trial court's continued concern that the issue of domestic violence had not been alleviated and support its conclusion that there was a likelihood of repetition of neglect if [the minor child] was returned to respondent-father's care. *See In re M.A.*, 374 N.C. 865, 874, 844 S.E.2d 916 (2020) (considering a parent's failure to comprehend and accept responsibility for their role in the domestic violence that plagued the family as supporting the court's determinations that there was a lack of reasonable progress and a likelihood of repetition of neglect); *see also In re L.N.G.*, 377 N.C. 81, 2021-NCSC-29, ¶ 23, 855 S.E.2d

450 (upholding the trial court's determination that there had not been meaningful progress to correct the causes of domestic violence where the parent failed to understand or adequately address the traumatic impact of domestic violence on her children); *In re A.R.A.*, 373 N.C. at 198, 835 S.E.2d 417 (upholding the trial court's determination that there had not been reasonable progress in addressing domestic violence where the parent continued to deny the effects of abuse on children, shifted blame to others, and refused to accept responsibility for the removal of the children).

*Id.*

As in *In re K.Q.*, the trial courts findings in the instant case support the termination ground of neglect since Father continued to deny his involvement in the episodes of domestic violence, refused to accept responsibility for the minor children's removal, continued to blame Mother as the sole cause for the minor children's removal, and failed to acknowledge the impact his actions had on the minor children. Moreover, Father failed to make adequate progress to several components of his case plan, providing further support to the trial court's conclusion. *See In re M.A.*, 374 N.C. at 870, 844 S.E.2d at 921.

We thus hold the trial court's findings of fact adequately support its conclusion of law—that Father's parental rights were subject to termination on the basis of neglect. In reaching this conclusion, the trial court properly considered the period of past neglect as well as the likelihood of future neglect if the minor children were returned to Father's care. *In re Z.A.M.*, 374 N.C. at 95, 839 S.E.2d at 797; *In re M.B.*, 382 N.C. at 86, 876 S.E.2d at 264. Furthermore, the trial court properly considered

Father's ability to care for the minor children at the time of the termination hearing, his change in circumstances since the period of past neglect, and his progress toward his case plan during those periods of time. *In re Z.G.J.*, 378 N.C. at 509, 862 S.E.2d at 187; *In re M.B.*, 382 N.C. at 86, 876 S.E.2d at 265; *In re Z.V.A.*, 373 N.C. at 212, 835 S.E.2d at 430.

## IV. Conclusion

For the reasons above, we hold the trial court did not commit error by concluding that Father's parental rights were subject to termination under N.C. Gen. Stat. § 7B-1111(a)(1). The trial court's adjudicatory findings of fact adequately support such a conclusion of law.

AFFIRMED.

Chief Judge DILLON and Judge HAMPSON concur.

Report per Rule 30(e).